Avid Radiopharmaceuticals  Avid Radiopharmaceuticals  Alzheimer's Institute of America v. Avid Radiopharmaceuticals When it comes to joint inventorship, where you have to show collaboration and concerted effort, some open line of communication during or in temporal proximity to the inventive efforts, they have a complete failure of proof on that. Not even their witnesses said these conclusions were communicated to Dr. Mullen. And keep in mind, Dr. Mullen is an ocean away from John Hardy. Yeah, but they did that purposely, didn't they? That is the allegation, but Dr. Mullen was in Florida three months before the Swedish families even got on the radar. So did Dr. Mullen go to Florida three months ahead of time before he even knew that Swedish families existed? No. I assume he went for the sunshine, but he was also working for the University of South Florida on the same problem. Well, I would like to discuss the preemption issue, because the Supreme Court has repeatedly held that the inventor's right to his own inventions is one of the fundamental precepts of patent law. And the district court here held that the Florida regulation effectively declares that the employee does not own the invention in the first instance. In other words, the Florida regulation as interpreted by the district court is squarely in conflict with federal patent law as articulated by the Supreme Court. So is your position on that point that the Florida regulation is illegal? Yes. But that parties cannot contract contrary to the state law? Parties can contract, and there are lots of cases dealing with that. But parties did not contract in this case. Dr. Mullen never signed an agreement agreeing that his rights in any invention would go over to USF. He has a release of rights? He never released – yes, he got a release of rights going the other way. USF released rights to him. But the regulation which says that the invention shall be the property of the university also requires him to sign an agreement acknowledging the terms of the regulation. The trial judge viewed that as an administrative step that wasn't critical to the validity of this regulation. Well, we would respectfully disagree with that, Your Honor, because if that is not required, then that puts the regulation squarely in conflict with federal law. I don't understand how federal law has any business in state ownership. This isn't a question of inventorship now. It's a question of ownership. Supreme Court cases going back a zillion years say patent ownership is exclusively the purview of state law, not federal law. So I don't understand your argument. You're right, Your Honor. Patent ownership is a question of state law. But what we're talking about is where does the ownership of the invention initially vest? And the Supreme Court in this court – No, what we're talking about is a state authorized by regulation to create a contract, in fact, with employees of its universities. And I don't see how any federal law has the ability to preempt or prevent a state from enacting regulations articulating or delineating terms of employment with its state employees. No such contract was signed here, Your Honor, and the difference is – and it said it applies to the period of employment from 1991 to 1992. So it was signed ex post, but it expressly says it applies to the prior year's employment. Yes, Your Honor, but it does not contain the provision required by the regulation. It actually does. At the top it says it recognizes and accepts all regs, rules, blah, blah, blah, Florida. It doesn't articulate with precision this particular reg you're pointing to, but the contract expressly says that both the contractor and the contractee understand these regs to apply. Yes, Your Honor, it does say that the regulations apply, but the contract specifically says – or the regulation specifically says that the employee has to acknowledge the terms of the regulation in writing. That wasn't done here. That would make this regulation consistent with federal law. Instead, we have a regulation that automatically divests an inventor of his invention. He never has any ownership of it, and this court has never dealt with that issue, Your Honor. All of the other cases deal with, for example, a federal statute divesting an inventor of his invention, which, of course, Congress can change federal law, or a foreign country doing the same thing. And, of course, a foreign law can do that within its territorial jurisdiction. Or a state law, which transfers ownership of the patent after the fact, but does not divest an inventor of his invention from the get-go, so that the inventor never owns the invention, never has the right to practice the invention. That is what is in conflict with federal law here. I would like to reserve the rest of my time for rebuttal, if I may. We will save your rebuttal time. Thank you. Mr. Johnson? Mr. Lipsy. Thank you. You may smile. It's nice to see a smiling lawyer. But, in part, you may smile because you think that previous discussion sort of teed up a great case for you, in the sense that if I can just support that jury trial, and there's a lot of good evidence that I'm sure you're going to trot out first, you've got a winner. But let me puncture that thought for a moment by this problem that I have. This is a circularity problem in this case. You've probably already recognized it, but let me see how you want to deal with it. The circularity problem is this. In order for you to win on the question of the validity of the patent, you have to stand on the jury verdict that there was a joint inventorship that was invalidly reflected in the application for the patent. If that's true, however, that means the patent was invalid. And he concedes that point. Mr. Marshall concedes that point. If the patent was invalid, then AIA could not bring a lawsuit on that patent. The trial judge couldn't have jurisdiction in order to hold a jury trial, which resulted in a judgment or a verdict and then a judgment that there was a joint inventorship problem. So you can't reach the joint inventorship jury verdict unless you can find some way to give the trial judge jurisdiction over an invalid patent. Now explain to me how you got there and how you're going to save us from that circularity problem. I will still smile, Your Honor, because I believe there's an answer, and that is it's well settled that courts have jurisdiction to determine if they have jurisdiction. Yes. There were two independent bases offered for why this court did not have jurisdiction due to lack of standing. One was that Mullen was not a sole inventor, as alleged, and in fact there were outstanding rights which were not being represented before the court, and therefore there was no standing, and there was an independent ground. Standing is a bit of a red herring in this case, really, even though the trial judge got all wrapped up in the standing issue. It really isn't standing. It's a question of whether there's a valid patent to sue on. You can call it standing if you want to, but I find the standing concept sort of at right angles to what we're trying to decide. I mean, in a way, what the judge did was cut the Gordian knot that was left by the muddle from this transaction. I think we proved at trial that there were two collaborations going on here, one to discover new Alzheimer's-causing mutations in the amyloid gene, but the other to try to deprive these universities of rights. And the judge decided to cut through that by saying, let's determine, there are lots of things we could determine, let's determine just does AIA have the ownership rights it needs to even begin this process, and there were two independent grounds. With all due respect to our trial judge, I think that jumps the issue. That's not the issue. The issue is not ownership because the question is, is there something to be owned? What is there to be owned? I mean, I think, Your Honor, I think even an invalid patent can be owned. Really? An invalid patent is a property interest to be owned? Mr. Lipsky, if you were to carry Judge Plager's argument out fully, wouldn't it suggest that no court could ever invalidate a patent under obviousness, unenforceability, inequitable conduct, non-enablement, because all of those cases would have to be thrown out for lack of standards? That was where I was going, and Your Honor said it much better than I could. Good. Go ahead. So, anyway, we had these two. There are cases, by the way, the Ethicon case is one that we've cited. There are a number of others where the absence of a joint inventor was found to deprive the party trying to sue on the patent of standing to do so, and it's that theory and line of cases that the trial judge was relying on. Now, the court having jurisdiction to make that determination of whether it had jurisdiction and assuming it's affirmed, it may well have preclusive effect if there were any ever attempt by somebody who did acquire all the rights to enforce the patent. There may well be a question of whether the patent is valid at that point, although I agree with Mr. Marshall. I think the likelihood of that happening is near zero. These patents have all expired. If I may just briefly touch on the evidence, we feel that the acts taken in furtherance of the collaboration to deprive the universities of ownership actually corroborate the collaboration and communication on the inventorship front. We know exactly what was supposed to happen. What was supposed to happen is they were supposed to identify promising families. They were going to do a GT12 analysis. This is all laid out in the Athena proposal. If the affected individuals all had the same amyloid gene, they were to sequence exon 16 and 17, which is what encode the actual amyloid protein, and that's exactly what happened here. Dr. Hardy brought into the lab these promising Swedish families. He had his technician, Mr. Holden, do a GT12 analysis. He was given the results. He looked at it. He determined that, in fact, all of the affected individuals had the same copy of allele 13 from the GT12 marker. He looked at it, and he said that he had concluded that the mutation was likely linked to the disease. This amyloid mutation was likely linked to the disease in family 144, and that was abundantly corroborated by Mr. Holden's independent testimony, who testified extensively on that, and that he couldn't tell whether it was linked or not for 139, and that he then sent the material to Florida, which was, Your Honors, the step that was to be taken in the other collaboration if they had a promising piece of DNA, because someplace else is where promising DNA was sent in order to have the final sequencing done. But inventorship is very narrowly defined. So if, in fact, the details of the Swedish mutation were not discovered until after Dr. Mellon was in Florida, then the fact that all of this collaboration had been taking place, how does that affect inventorship? The phenol oil and Vanderbilt cases make clear that a co-inventor need not have a mental picture of the full and complete structure of the ultimate molecule in order to make a significant contribution to that conception, because otherwise you could never have joint inventors. Each individual inventor would have to be a sole inventor of the invention. It's kind of like the situation, you would not suggest that the roughneck who drills an oil well and has a gusher come out of it is the sole discoverer and owner to the exclusion of the people who told him where to dig the well. And the people who told them where to dig the well in this case were Hardy and Mellon, and certainly Hardy, and that was amply corroborated by the testimony of Holden, by the testimony of Duff, who said that Mellon told her that they knew there was a mutation in that DNA before they ever sent it to Florida, and by the plan to make sure that the final sequencing was done. I'm not so sure. The evolution of the law here, when it was known that it was a mutation, it was known that there were the Swedish families who carried the mutation, and until that specific mutation in the DNA in the sequence was identified, was there an invention? The fact that there was Alzheimer's disease in the Swedish family did not mean that it was a mutation in the amyloid gene. That was exactly what Dr. Hardy was trying to find out. That's why they did the analysis with GT12, which is uniquely intended to determine whether it's in the amyloid gene. Dr. Hardy got that analysis back, and he was the kind of scientist who would look at that, and by I, experienced scientist, say all of the affected people have this mutation. It seems to be being inherited, the disease, with this copy of the gene. I conclude that there's likely an amyloid mutation causing this disease, and because I don't want Imperial to own it, I'm going to send it to Dr. Mellon, along with the GT12 data, which could only be used for analyzing linkage to amyloid, and in order to have it sequenced outside the university in accordance with the basic plan back from the Athena Agreement that said in those circumstances, that's what you did. So, that is a contribution to the conception. That's Dr. Hardy telling you where to drill the well. Now, did he know there was oil there? He thought it likely that there was oil there, enough to commit the resources of his laboratory to actually do that experiment. Now, neither Dr. Hardy nor Dr. Mellon knew before Fiona Crawford showed up and actually did the experiment, where exactly that DNA mutation was, or what exactly it was. Yet, there's no dispute that Dr. Mellon is a co-inventor, and Dr. Hardy is everyone. Why? Because if I were to understand and accept the facts that you just alleged, it seems that Mr. Mellon is the ruffian who drilled the well where Dr. Hardy told him to. You just said there's no dispute that Mr. Mellon is a co-inventor, yet under your definition of inventorship, if I accept it, Dr. Hardy did all the inventing and all Mr. Mellon did was test the sample and reach the conclusion Dr. Hardy surmised was there all along. To carry the analogy forward, and I'm uncomfortable advocating my adversary's position, but I will do so, there were two types of analyses that were done to determine where to drill the well. Dr. Hardy used his experience and judgment in the pattern in the GT-12 analysis. Dr. Mellon did a very sophisticated computer-based analysis of the data, which calculated this logarithm of the odds number, which was an indication of whether there was likely linkage. And those two together are what dictated where to drill the well. Does it matter to your case whether it's a question of joint ownership or whether, as suggested by Judge Moore, it was actually Dr. Hardy who was the inventor? Well, we did not try the issue of whether Dr. Mellon was not an inventor at all, but it would not matter to my case at all if that were the determination. Why? If Mellon were not an inventor, then he could not have conveyed to AIA any rights to sue on this patent and there would be no standing. Why not? Because there was no patent? No, because he was not the inventor and therefore the assignment that he executed, assigning his inchoate rights, conveyed nothing. He had no rights to convey. But the inventorship can be corrected, can it not, at this stage? It theoretically could. I agree with Mr. Marshall. I think it's entirely possible. Unless there were motives, the record hints at all sorts of motives that might, I suppose, inhibit correction. But that certainly was not developed. That is correct. That was not. But that clearly requires no bad motive, is that right? Not any longer, actually. For an action commenced today under the AIA, the deceptive intention requirement has been eliminated. But it does require concerted application by all parties. It seems to me I'd love to be in the room when Hardy and Mellon and AI and all of the others were going to jointly file the application for correction. It seems that popcorn would be in order to watch that negotiation. I would agree, Your Honor. It might be a slasher movie. What are the consequences, Mr. Lipsy, to your position if the jury verdict is upheld, that there was a joint inventorship issue at this stage of the case? Where does that leave you and where does that – does that moot all the other issues? Where are we? We struggled with this issue, where there are two independent bases for determining that there is no standing. What should the court do? And we did find – it seems to be in the discretion of the court what to do. We did find one case where both were dealt with, and I would urge the court to deal with both now, because we don't want to be back in court sometime later in case something happens to moot one of the other issues. And that was the Sackler v. United States, 815 F. 2nd, 1488. Say that again. 815 F. 2nd, 1488. Okay. Not a patent case, but for the idea that there were two arguments there for why there was no standing. Would we read something that wasn't a patent case? Yes, yes, of course. What court was that? That was from this court. I guess I'm still confused. Help me. You heard my questions to opposing counsel. How can the conclusion that there has to be joint inventorship result in no standing? Because if that were true, I'm just finding it difficult to understand our prior 102F cases, which decided invalidity. Like, how could you ever invalidate a patent under 102F if really the result, when you decide there's a missing inventor, is no standing? You see where I'm going? I see where you're going. It's not standing, it's invalidity if you're correct about the facts. So, I mean, maybe there's no standing based on the ownership. That's a separate question. But to the extent that this court concluded there was no standing by virtue of the jury's determination that Hardy ought to be a co-inventor, I'm struggling with that, because that feels to me like a ground for invalidation, but not a ground for lack of standing. This may seem like a fine distinction, but one sees it in the reported cases. When you're dealing with standing, you're not really talking about the defense, the defense that the patent is invalid or something like that. What you're saying is, all I'm looking at is, does this person who has come in here as the party plaintiff have the appropriate title and rights and are the appropriate people here in court to even get off the ground in this lawsuit? And that's what the court decided. The court decided, no, there's another joint inventor here who's got rights. AIA doesn't control them. They don't have the right people here, and this suit has to be dismissed. It leaves for another day what might happen if they, for example, which is why we urge the court to reach both these issues. If the court didn't and whatever the issue was was undone, we were back in court having to litigate. And the jury just sounds like a co-inventor. Correct. But what that meant was that there was an owner, according to AIA's theory, the instant he conceived the invention, there was an owner whose rights AIA didn't have and who had not joined as a party plaintiff. And it implicates at a minimum prudential standing in that you shouldn't go off and litigate one of these issues unless you have all of the stakeholders there. Now, are there ways that you could perhaps deal with that? I know Judge Newman has addressed ways that you might deal with that in the Ethicon case. They seem unlikely at this point for the reasons Mr. Marshall noted. Any more questions? No, thank you. Thank you very much. Your Honor, Mr. Lipsy talked about that Hardy glanced at the data by eye, believed that there was linkage, and so he told Mullen where to drill the well, told him where to sequence. And that's where there is a complete failure of proof, Your Honor. Even Hardy was not able to testify that he ever told Mullen where to drill the well. He repeatedly said, I don't recall ever saying that. I don't recall ever telling Mullen that there was linkage. I don't recall ever telling Mullen that you should sequence amyloid. Henry Holden, who was put up as a corroborating witness, also testified that he never recalled telling Mullen those things. He never recalled hearing John Hardy tell Mullen those things. But is transferring the DNA samples the equivalent? Because what else would be the point of the DNA samples with the suggested sequencing to occur? Because they were moving the lab to Florida. So let me just pluck out these ones and have you sequence them. Because the rest are coming, but these are just randomly selected to move first. There were many DNA samples moved to Florida. And the research plan that was written in January of 1992, just a couple of months before this discovery was made, basically said that we're going to create a genomic library so that we can do linkage studies for areas other than APP, areas other than the amyloid gene. Dr. Mullen was the genetic linkage expert. He was the person who was experienced with the – in fact, actually wrote some of the software that calculated the genetic – Didn't Mr. Holden testify that Hardy told him to give these exact DNA samples from the Swedish family to Mullen for sequencing? Yes, Your Honor, he did testify to that. But what was never testified to was any communication to Dr. Mullen. The DNA was sent along with a lot of other DNA. The family pedigrees were sent along with a lot of other family pedigrees. The genetic analysis, the GT12 data was sent. But there was no communication to Mullen, you should sequence on the amyloid gene. And in fact, the research plans talk about them looking for mutations in areas other than the amyloid gene. And that's what Dr. Mullen was expert at, was finding genetic linkage. That's what he did. So if you're going to send something to someone to just sequence the amyloid gene, why do you send the data? Why do you send it to Dr. Mullen, who's not a sequencer? He is a genetic linkage expert. That's what he does. He was sent the DNA, it's our position, and the data because Dr. Hardy didn't find linkage with the amyloid gene, which is what he said in 1992. So we now have a witness who's coming in saying the exact opposite thing 20 years later, and there is no evidence whatsoever in the record that he communicated any alleged conclusions to Dr. Mullen. Without that communication, there cannot be joint ownership. One quick question, because I know your time is over. Mr. Lipsy said all the patents at issue are expired. I thought there was a more recent continuation. Is that not an issue in this case? There was a more recent continuation, Your Honor, but I believe that one has expired as well now. Okay. The transgenic mice one. Correct. Okay, just wanted to be clear. Yes. Okay. Thank you. Thank you, Mr. Marshall and Mr. Lipsy. The case was taken under submission.